UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------- x
TJT CAPITAL GROUP, LLC,                                       :
                                                              :
                              Plaintiff,                      :
                                                              :        **MEMORANDUM &**
v.                                                            :        **ORDER DENYING**
                                                              :        **MOTION FOR**
TIMOTHY MCFADDEN,                                             :        **TEMPORARY**
                                                              :        **RESTRAINING ORDER**
                              Defendant.                      :
                                                              :        3:25-CV-00242 (SFR)
------------------------------------------------------------- x

**Sarah F. Russell,** United States District Judge:

Plaintiff TJT Capital Group, LLC ("TJT") brings this action against Defendant Timothy McFadden ("McFadden"), a former member, asserting McFadden has misappropriated trade secrets in violation of the Connecticut Uniform Trade Secret Act ("CUTSA"), Conn. Gen. Stat. §§ 35-50 to 35-58, breached his fiduciary duty to TJT, and committed various other violations of state and federal law.

TJT filed its complaint on February 15, 2025. ECF 1. On February 20, 2025, TJT moved for a temporary restraining order ("TRO") and preliminary injunction. ECF 13. On February 25, 2025, I convened a telephonic status conference to set a briefing and argument schedule. At the status conference, TJT requested that I hold oral argument on the TRO request on an expedited basis and thereafter hold a hearing on the motion for a preliminary injunction. McFadden filed a response brief on February 28, 2025, and I held oral argument on the TRO request on March 3, 2025. For the reasons set forth below, TJT's request for a TRO is denied. The motion for a preliminary injunction will be adjudicated after an evidentiary hearing.

I.  **BACKGROUND**

TJT is a registered investment advisor ("RIA") in Stamford, Connecticut. Before his termination from TJT on February 12, 2025, Defendant Timothy McFadden was a member of TJT along with Timothy McMullan and James Cook. The three members formed TJT in 2009 following their departure from Genworth Financial Wealth Management, Inc. ("Genworth"). ECF 15, McMullan Decl. ¶¶ 7-8; ECF 37-1, McFadden Decl. ¶ 7.

In late October 2024, McFadden announced he would be leaving TJT. ECF 37-1, McFadden Decl. ¶ 29. Around that time, TJT was notified of an SEC audit. McFadden, who served as TJT's Compliance Officer, agreed to stay at TJT to complete the work needed to comply with the audit. *Id.* ¶ 33. In anticipation of his departure from TJT, on October 25, 2024, McFadden created a list of all TJT clients by accessing a Schwab database. *Id.* ¶ 36. TJT uses Schwab as a third-party custodian of the client accounts managed by TJT. McFadden then deleted all data relating to the clients advised by McMullen and Cook so that only the clients McFadden advised remained. *Id.* In November 2024, McFadden emailed himself a copy of this list, *id.*, which has been filed as a sealed exhibit in this case. ECF 40. The list contains the following information: client name, residence address and/or email address, and Schwab account number. ECF 37-1, McFadden Decl. ¶ 37. The 171 accounts listed are held by about 90 client households. *Id.* ¶ 40. McFadden states that approximately 45 have been his clients for more than 20 years (pre-dating the formation of TJT) and a significant number are "friends and family," meaning people who became clients through close personal relationships. *Id.*

TJT asserts that McFadden secretly registered with Value Investment Professionals, LLC ("VIP"), a competitor, on February 5, 2025, while still a member of TJT. ECF 15, McMullan Decl. ¶ 10. After learning of McFadden's registration with VIP, McMullan and Cook terminated

2

McFadden from TJT on February 12, 2025, and directed their counsel to notify McFadden of his termination, demand the return of TJT property, and instruct McFadden not to contact TJT clients or come into the office. *Id.* ¶ 48. TJT states that McFadden took action to divert clients even before he left TJT by reaching out to clients by email and arranging calls. *Id.* ¶¶ 33-36. On the day of his termination, February 12, 2025, McFadden emailed a client announcing that he had joined VIP and stating: "I will continue to manage your accounts as part of VIP." The email asked for the client to sign an authorization using DocuSign and told the client to "please disregard any communications from TJT Capital." *Id.* ¶ 43; ECF 15-11. On February 20, 2025, McMullan wrote to TJT clients saying TJT valued their business and stating: "I want to personally inform you that Tim McFadden is no longer with us, and I will be directly managing your accounts." ECF 41-1 at 2.

TJT states that as of the filing of the complaint on February 15, 2025, McFadden had diverted eight client accounts to himself and VIP. ECF 15, McMullan Decl. ¶ 4. By the filing of the TRO request on February 20, 2025, McFadden had diverted 41 client accounts totaling $37 million in assets under management. *Id.* By oral argument on March 3, 2025, McFadden had diverted 107 accounts totaling $63.5 million in assets under management.

## II.   DISCUSSION

On February 20, 2025, TJT moved for a TRO and preliminary injunction. TJT seeks an order prohibiting McFadden (and those aiding and abetting or acting in concert with him) from (1) using or disclosing TJT confidential client information, lists, or any of its other confidential and proprietary business property, data, and trade secrets for any purposes other than as authorized by the Federal Rules of Civil Procedure for this pending litigation; (2) contacting or communicating with current clients or known client prospects of TJT except for those individuals

3

who have already entered into a binding written agreement with VIP or to the extent McFadden can demonstrate that such individual's information was not included in confidential information acquired by McFadden from TJT; (3) disclosing confidential or proprietary business information regarding TJT's operations where such information is a protected trade secret or is confidential information that McFadden learned during the course of his association with TJT; and (4) using or disclosing TJT confidential client information, lists, data, or other proprietary and confidential business information for McFadden's own benefit or advantage or the benefit or advantage of a third party. TJT also seeks an order requiring McFadden to retrieve from VIP any of TJT's client information, lists, or data previously provided to VIP and return such information to TJT, except to the extent that any transmittal was specifically authorized by a client or prospect under a binding written agreement with the VIP. ECF No. 13 at 3-4. At oral argument on this motion, counsel for TJT clarified that if McFadden can prove he had a client's contact information outside of the client account list or data he obtained from TJT, then contact with that client would be outside the injunction TJT is seeking. In addition, counsel suggested that the injunction should not prohibit McFadden from speaking to a client when the client has initiated the contact via an inbound call to McFadden.

    In this Circuit, the standard for an entry of a TRO is the same as for a preliminary injunction. *Kreger v. McCance*, 537 F. Supp. 3d 234, 239 (D. Conn. 2021). A movant must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* at 240 (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)). These are "extraordinary and drastic" remedies, which "should not

4

be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (internal quotation marks omitted). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted). To satisfy the irreparable harm requirement, plaintiffs must demonstrate that "absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (internal quotation marks omitted).

In support of its TRO request, TJT asserts that McFadden violated his fiduciary duty to TJT and the client account list is a trade secret that McFadden misappropriated in violation of CUTSA. ECF 14 at 4-11. TJT argues that a finding of irreparable harm is warranted "'because [a] trade secret once lost is, of course, lost forever'" and such a loss "cannot be measured in money damages." ECF 14 at 12.

But a presumption of irreparable harm does not automatically apply in trade secret cases. As Judge Cabranes explained in *Faiveley*:

> We have previously observed that "the loss of trade secrets cannot be measured in money damages" where that secret, once lost, is "lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (per curiam). Some courts in this Circuit have read this passing observation to mean that a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated. *See, e.g.*, *Ivy Mar Co. v. C.R. Seasons, Ltd.*, 907 F. Supp. 547, 567 (E.D.N.Y. 1995) ("[I]rreparable harm is presumed where a trade secret has been misappropriated."). That reading is not correct. A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the

5

originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge. As Judge Conner has observed, where there is no danger that a misappropriator will disseminate proprietary information, "the only possible injury that [the] plaintiff may suffer is loss of sales to a competing product . . . [which] should be fully compensable by money damages." *Geritrex Corp. v. Dermarite Indus.*, LLC, 910 F. Supp. 955, 966 (S.D.N.Y. 1996) (Conner, J.).

559 F.3d at 118-19.

Here, TJT has not established a realistic danger of McFadden disseminating the client account list to a wider audience or otherwise irreparably impairing the value of the information on the list. There is no indication that McFadden intends to use this list for any purpose other than pursuing profit at VIP. TJT has not adequately explained why the loss of clients to McFadden at VIP cannot be redressed with money damages.[1] *See Merrill Lynch, Pierce, Fenner & Smith Incorporated v. Liniere*, 572 F. Supp. 246, 248-49 (N.D. Ga. 1983) (rejecting argument that if account executive "succeeds in pirating established customers away from Merrill Lynch, that loss of business will irreparably harm Merrill Lynch" because the "real loss is in commission revenue generated by [defendant] from former Merrill Lynch customers, and that can be readily calculated from the commissions he and his new firm derive from the old Merrill Lynch customers" and thus "any loss of business to Merrill Lynch may be adequately redressed with money damages").

This case differs from *Genworth Financial Wealth Management, Inc. v. McMullan,* 721 F. Supp. 2d 122 (D. Conn. 2010), where the court found irreparable harm and entered a preliminary

---

[1] At oral argument, counsel for TJT speculated that McFadden may have taken more client information than he has acknowledged. But there is no indication that McFadden took information other than the list of clients he had personally advised while at TJT, *see* ECF 37-1, McFadden Decl. ¶¶ 37-39, or that he shared that information with anyone outside of VIP. Mere possibility of harm is insufficient to meet the standard for a TRO. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy."). Counsel also speculated that McFadden may not have funds to pay any eventual judgment against him. Again, however, evidence supporting this assertion has not been provided.

injunction following an evidentiary hearing. There, the defendants—who included the same three individuals as the present case—left Genworth to establish TJT, and, Genworth asserted, took "confidential documents including Genworth's Automated Contract Tracking (ACT) database, which contains client names, phone numbers, contact information, portfolio management history, and client notes." *Id.* at 123-24. In determining that Genworth established irreparable harm, the court found "the evidence shows the Defendants' unabashed attempt to destroy Genworth's goodwill and customer relations, in addition to converting Genworth customers to TJT." *Id.* at 130.

The *Genworth* court concluded that the plaintiff had established irreparable harm in part because defendants had shared confidential information with attorneys preparing to litigate a class action against the plaintiff. Evidence showed that a defendant (McMullan) "not only directed former Genworth clients to speak with [the class action lawyer], but provided proprietary Genworth information regarding asset allocation directly to [the lawyer] in order to initiate the class action." *Id.* at 129. Based on the evidence presented at the hearing, the court concluded "that McMullan disclosed proprietary information to lead class counsel, and that such information pervades the class action complaint, further demonstrating that the Defendants have misappropriated protected, proprietary Genworth information and is motivated to further impair both the value of Genworth's reputation and the exclusivity of the information in question." *Id.* at 130.

In contrast, in the present case, TJT has not provided evidence that McFadden has taken action to impair the value of the client account list or its exclusivity. Instead, it appears McFadden has been using the client account list in pursuit of profit. In addition, the only allegation that McFadden has sought to cast TJT in a negative light is the statement in his email

7

to a client that the client should "disregard any communication from TJT Capital." ECF 14 at 2; ECF 15-11. However, this statement falls far short of the type of evidence presented in *Genworth*, where the defendants shared information to aid in the filing of a class action by investors against Genworth and otherwise took action to "destroy Genworth's goodwill and customer relations." *Genworth*, 721 F. Supp. 2d at 130.

"To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (internal quotation marks omitted). Based on the current record, TJT has not demonstrated irreparable harm because it appears the harm alleged may be remedied with monetary damages after TJT has litigated its claims.[2] TJT's request for a TRO is thus denied. Should TJT wish to pursue its motion for preliminary injunction, I will hold an evidentiary hearing on that motion.

**SO ORDERED.**

Bridgeport, Connecticut
March 7, 2025

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge

---

[2] Because I have determined that TJT has failed to establish irreparable harm, I do not consider the strength of TJT's claims or the balance of the equities. *Inkel v. Connecticut*, No. 3:17cv1400 (MPS), 2019 WL 1230358, at *10 (D. Conn. Mar. 15, 2019) (stating that where "a plaintiff does not establish irreparable harm, the court need not address the other factors necessary for the issuance of injunctive relief") (internal quotation marks omitted).