## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

---

TJT CAPITAL GROUP, LLC,

        Plaintiff,

        v.

TIMOTHY MCFADDEN, VALUE
INVESTMENT PROFESSIONALS, LLC
and ANDREW HODGES,

        Defendants.

Case No.: 3:25-cv-00242 (SFR)

**AMENDED COMPLAINT**

April 7, 2025

---

Plaintiff, TJT Capital Group, LLC ("Plaintiff", "TJT Capital" or "Company") by its attorneys, Lazare Potter Giacovas & Moyle LLP, brings this action against Defendants Timothy McFadden ("McFadden"), Value Investment Professionals, LLC ("VIP"), and Andrew Hodges ("Hodges") (together, "Defendants") and alleges as follows:

## **NATURE OF THE ACTION**

1.      Plaintiff, TJT Capital, a registered investment advisor ("RIA") based in Stamford, Connecticut, brings this action against McFadden, a former member, investment advisor, and Chief Compliance Officer ("CCO") of the Company, arising from his brazen and calculated theft of the Company's confidential and proprietary client information which was used to compete with TJT Capital for months before his sudden departure, all in breach of his fiduciary duties to the Company. As detailed below, McFadden's theft of TJT Capital's confidential client information and improper diversion of TJT Capital's client accounts was aided and abetted by Defendants VIP and its founder and principal owner, Hodges.

2.      McFadden's actions, aided and abetted by VIP and Hodges, have caused substantial and irreparable harm to TJT Capital's business and goodwill, as some 125 client accounts totaling

over $70 million in assets under management have moved to VIP. Defendants' premeditated and coordinated efforts were designed to hurt Plaintiff's business and forever poison the well with those departed clients. McFadden specifically instructed those clients to ignore any communications from TJT Capital while he secretly raced to convert them into VIP clients to thwart any opportunity that the Company had to retain them.

3.       TJT Capital accordingly seeks an award of damages against Defendants in an amount to be determined at trial but no less than $2.5 million representing loss of management fees and value of its business, together with a permanent injunction to prevent Defendants' use, possession, or disclosure of the Company's confidential client information, which, upon information and belief, includes confidential client information for TJT Capital clients that remain with the Company.

## THE PARTIES

4.       Plaintiff TJT Capital is a limited liability company organized under the laws of Delaware with its principal place of business at 9 West Broad Street, Suite 420, Stamford, CT 06902. It currently has two members: Timothy McMullan ("McMullan"), who is a resident of Connecticut, and James Cook ("Cook"), who is also a resident of Connecticut.

5.       Defendant McFadden is an individual and a former member, investment advisor, and Chief Compliance Officer for Plaintiff, who had been with the Company since its inception in 2009 until his sudden and secret departure. McFadden is a resident of New York, whose address is 4250 Van Cortlandt Park East, Apartment 2G, Bronx, NY, 10470.

6.       As a result of his actions, alleged herein, including his surreptitious and unauthorized registration with another RIA, McFadden was terminated for cause from all roles with the Company and has also effectively resigned, abandoned, and/or withdrawn from his membership in TJT Capital. McFadden is now a managing member of Defendant VIP.

7.    Defendant VIP is a registered investment advisor based in New York, with a registered principal office address of 125 Park Avenue, 25th Floor, New York, New York 10017.

8.    Defendant Hodges is VIP's founder, principal owner, chief compliance officer and a managing member.  Hodges is a resident of New York.

## JURISDICTION AND VENUE

9.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because there is a complete diversity of citizenship as Plaintiff's current members are all citizens of Connecticut and Defendants are citizens of New York, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this matter presents a federal question under both the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 et seq, and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq.

11.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

12.    The Court has personal jurisdiction over all Defendants, and venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

13.    TJT Capital is a registered investment advisor founded in 2009.  The Company provides investment advisory services to private clients and, prior to McFadden's departure, had $360 million assets under management.

14.    From its inception, TJT Capital has been owned and operated by members McMullan and Cook, who together have decades of experience in the investment management industry.  Among other roles, both McMullan and Cook operate TJT Capital's business and directly manage and supervise client accounts for the Company, including servicing accounts whose primary contact was McFadden and distributing a financial market newsletter to their clients to provide context for their investment decisions.

15.    McFadden was also a founder of TJT Capital and prior to the events alleged herein, was a member in TJT Capital who managed and supervised client accounts.  In addition, McFadden had been the Company's Chief Compliance Officer since 2012.

16.    Over the last year, McFadden had increasingly failed to discharge his duties to the Company.  Coinciding with his purchase of a house in Delaware, he was noticeably more absent from the Company's Stamford office during regular business hours, especially on Fridays and Mondays. Because the Company was a small, three-member advisory firm, it had always been important – and TJT Capital's regular practice since inception – that business be conducted in person in its Stamford Office.  In 2024 alone, however, McFadden was absent from the office for a total of nearly two months.

17.    In the Spring of 2024 and increasingly thereafter, McFadden did not see eye to with his partners at TJT Capital.  Tensions initially rose at a member meeting in April 2024 at which McMullan raised a legitimate concern over McFadden's office attendance, as both he and Cook had noticed McFadden's increasing absences of late.  McFadden became incensed at McMullan for raising this straightforward issue, and railed at him and Cook that they should just sell the business, even suggesting that he "knew people" and would make calls to investigate a sale.  Though it was McFadden's idea, he apparently took no bona fide steps in that regard, leaving the task to McMullan

and Cook, who began transparent, good faith attempts to explore a possible sale opportunity to benefit all three members over the next few months.

18.    By mid-October 2024, in yet another emotionally charged tirade, McFadden had cooked up a new grievance, now complaining for the first time that he was unhappy with his remuneration, even though the Company's payment structure reflected a distribution percentage that *he* long ago proposed and had continually agreed to every year for more than a decade.  As it turned out – unbeknownst to his partners at the time – this groundless charge was all part of McFadden's artifice because he never intended on participating in the sale process he demanded.  Instead, McFadden was devising and executing a plan to feather his own nest, prevent a sale of Plaintiff's business as a whole, and devalue TJT Capital on his way out the door.

19.    Indeed, it was precisely because McFadden expressed a desire to leave the Company in October 2024 that Cook connected McFadden with the Company's CPA to obtain a necessary Company valuation.  Though, as a result of McFadden's actions over the next few months, detailed herein, further steps towards a sale ultimately did not proceed very far, there were many possible scenarios that could have resulted in a sale of the business which benefited all three members and allowed McFadden to obtain the result he desired.  One such sale concept was as an "RIA rollup", meaning Plaintiff would be acquired by another RIA.

20.    An RIA rollup would have allowed McFadden to continue working for the new RIA without directly interfacing with Cook or McMullan if he chose, or, simply cash in on the sale, or any number of other viable scenarios that would have maximized the value of the Company.  Indeed, typically, an acquisition would result in a premium paid on any purchase price to be calculated from the total assets under management of the selling RIA.  For TJT Capital, that was approximately $360 million assets under management before McFadden's duplicitous departure. Although McFadden was

put in touch with the Company's CPA, was directed to an appropriate firm to conduct the valuation, and was authorized by Cook and McMullan to proceed with the valuation, McFadden had no interest in an orderly exit that would have maximized the value of the Company and the resulting payout to all of its members, including him.

21.     Rather than proceed with the valuation in the Fall of 2024 – or constructively and forthrightly engage with both of his longtime business partners on a viable path forward that would have preserved the maximum value of the Company – McFadden secretly began a months' long courtship with Hodges, the founder of a much smaller, competing RIA, Defendant Value Investment Professionals, LLC.  As a smaller RIA, McFadden knew that VIP was desperate for assets and as such McFadden promised to deliver – and has now delivered – substantial TJT Capital client assets to VIP, increasing VIP's assets under management ("AUM") by 50%, from approximately $141 million to over $210 million, while also increasing its total number of client accounts by 150%, from 83 accounts to 208 accounts.  He did so based upon efforts he undertook for months *before* leaving TJT Capital, all in breach of his fiduciary duty and duty of loyalty to Plaintiff, and with the help of VIP and Hodges.

22.     Indeed, because VIP could have never bid for TJT Capital as a whole, or otherwise acquired TJT Capital's client assets, McFadden found a ready and willing partner in Hodges and VIP, with whom, upon information and belief, McFadden shared TJT Capital's confidential client information – including their Schwab account numbers – long before he stopped working for TJT Capital, all as part of their combined effort to peel off a significant chunk of Plaintiff's business. Unfortunately for TJT Capital, the prospect of leaving his former partners McMullan and Cook with a devalued business in the wake of his departure only further instigated McFadden's breach of loyalty to the Company.

23.     McFadden never even advised McMullan or Cook – and certainly never obtained their permission or authorization – to actually register with another RIA while maintaining his registration with TJT Capital.

24.     Not only did McFadden fail to disclose his February 5, 2025 registration with VIP to his partners, but to the contrary, he continued to show up in Plaintiff's office and actively hold himself out as a fully participating fiduciary of TJT Capital for the next week.

25.     Though McFadden had previously expressed a desire to move on from TJT Capital, he took steps to keep his dual registration quiet for as long as possible while secretly working at cross purposes with TJT Capital.  In that vein, he even went so far as to lie to TJT Capital's office administrator on the morning of February 12, telling her that snowy roads prevented him from coming into the office when in fact, he was at home working to move TJT Capital clients over to VIP.

26.     As soon as the Company discovered McFadden's registration with VIP later on February 12, it informed him that evening that he was terminated from all roles with TJT Capital for cause and advised him that he was no longer permitted to hold himself out as having any association with TJT Capital.  The Company also requested that he return all Company property, including but not limited to his Company computer, office building key fob, and office suite door key.  Despite repeated requests, McFadden chose not to return that Company property for weeks.

27.     The Company also reminded McFadden of something he already knew: all client account information is the property of the Company and also constitutes confidential proprietary business information subject to trade secret protection.

28.     Ownership of Company property is specifically addressed in TJT Capital's Limited Liability Company Agreement ("LLC Agreement"), to which McFadden is bound.  Section 2.10 of the LLC Agreement states:

> Title to LLC Property.  All property owned by the LLC, whether real or personal,
> tangible or intangible, shall be deemed to be owned by the LLC as an entity, and no
> Member, individually, shall have any ownership of such property.  The LLC may hold
> any of its assets in its own name or in the name of its nominee, which nominee may
> be one or more trusts.  Any property held by a nominee trust for the benefit of the LLC
> shall, for purposes of this Agreement, be treated as if such property were directly
> owned by the LLC.

29.     Indeed, since inception and throughout its fifteen-plus years of operation, substantial expense and effort have been incurred by Plaintiff in procuring and retaining all of its clients – including all the TJT Capital clients that McFadden serviced.  It was Plaintiff (and not any individual member of TJT Capital) that took out a significant loan to fund TJT Capital's first years in operation.  And it is Plaintiff (and not any individual member of TJT Capital) that has likewise always paid for all the third-party vendors and service providers that support Plaintiff's ability to operate, without which McFadden would not have been able to service any of the TJT Capital clients he worked with while at TJT Capital.

30.     In addition, the Company's Privacy Policy, which was part of its SEC-mandated Policies and Procedures ("P&P"), stated that TJT Capital "keep[s] confidential nonpublic personal information about each TJT client" and that "[t]he purpose of TJT's Privacy Notice, Privacy Policy as well as its underlying procedures is to protect the confidentiality and security of its clients' nonpublic personal information."  The full Privacy Policy and Privacy Notice read as follows:

> The purpose of TJT's *Privacy Notice, Privacy Policy* as well as its underlying
> procedures is to protect the confidentiality and security of its clients' nonpublic
> personal information. The categories of nonpublic personal information that TJT
> collects from a client depend upon the scope of the client engagement. It may include
> information about the client's personal finances, information about the client's health
> to the extent that it is needed for the planning process, information about transactions
> between the client and third parties, and information from consumer reporting
> agencies. TJT has instituted certain technical, administrative and physical safeguards
> through which TJT seeks to protect this *nonpublic personal information* about current
> and former clients from unauthorized use and access. First, technical procedures are
> used in order to limit the accessibility and exposure of client information contained in
> electronic form. Second, administrative procedures are used in order to control the

number and type of employees, affiliated and nonaffiliated persons, to whom customer information is accessible. Third, physical safeguards have been established to prevent access to client information contained in hard-copy form. As illustrated above, TJT realizes the importance of information confidentiality and security, and emphasizes practices which are aimed at achieving those goals.

31.    It states further that "TJT has instituted certain technical, administrative and physical safeguards through which TJT seeks to protect this nonpublic personal information about current and former clients from unauthorized use and access."  These safeguards encompassed both electronic records – which were password protected in the Company's computer system – and hard copy records – which were kept in the office safe from public access and were only accessible to authorized personnel with a building key fob and office suite key.

32.    The Privacy Policy likewise stated that "*TJT Capital Group company information* means that the *Privacy Policy* also extends to the company's proprietary, confidential and 'trade secret' information.  All information is deemed to be proprietary, confidential and a 'trade secret' unless otherwise noted."

33.    Every year, Defendant (and TJT Capital's other members) acknowledged in writing that they were aware of, and in compliance with, TJT Capital's Policies and Procedures, including the Privacy Policy.

34.    Defendant was also bound by, and acutely aware of, the Privacy Policy and related procedures owing to his role as Chief Compliance Officer.  TJT Capital's Policies and Procedures stated:

> The Firm has designated the Chief Compliance Officer (or his/her designee, etc.) with the responsibility for administering, maintaining, and enforcing the Firm's Privacy procedures.  The Chief Compliance Officer shall be responsible for reviewing the Policy, identifying and assessing threats to information security, developing solutions to counter the identified risks, and ensuring compliance with the Policy by Firm personnel.

35.    In other words, McFadden – as Chief Compliance Officer – was directly responsible for managing the Company's Privacy Policy and related procedures.

36.    This included administering, and signing on behalf of the Company, TJT Capital's "Non-Disclosure Agreement of Confidential and Proprietary Information for Exiting Employees", which made clear that Plaintiff considered its client information to be confidential and proprietary, reciting that TJT Capital personnel "had access to confidential and proprietary information of TJT that is not generally known to the public or to the financial services industry" and prohibited disclosure of "any confidential information entrusted to them by TJT, a client of TJT or any other third party that TJT does business with . . . [which] includes, but is not limited to, information related to proposed, ongoing, or completed transactions of TJT, client information, client lists (past, present, or prospective), trade secrets, marketing plans, confidential information of TJT and business plans."

37.    As Chief Compliance Officer, Defendant was also responsible for liaising with the SEC and responding to its inquiries, examinations, and audits on behalf of TJT Capital, and repeatedly attested to the SEC to the existence and efficacy of the Company's privacy policies and procedures. Indeed, as recently as January 31, 2025, he responded to an SEC examination and stated, among other things:  "we have endeavored to ensure proper implementation of our Firm's current policies and procedures as set forth in the Firm's compliance manual."

38.    Nonetheless, the Company has now discovered – and McFadden has admitted – that on November 17, 2024, as part of his ongoing effort to divert TJT Capital clients to VIP,  McFadden sent a copy of TJT Capital's client list to his personal email.  He then deleted the message in an attempt to cover his tracks.

39.    That client list included client account information for 171 client accounts, including the names associated with each account, client contact information on file with TJT Capital (i.e. email

and/or mailing addresses) and – critically – the Schwab account number associated with each account. It was the compilation of this information (names, addresses *and* associated account numbers) that provided immediate value to McFadden, which is why he made sure to take the account numbers too.

40.     In so doing, McFadden exceeded and misused his authority to access the Company's non-public, password protected, confidential client information that was stored on its computer system (supported by third party service providers such as Schwab) in order to retain this information, including account numbers, for his own personal – and VIP and Hodges' – use and benefit, to the detriment of Plaintiff.  McFadden's access to these systems, including the Schwab database, was based upon his association with TJT Capital; he had no authority to access these computer systems or the information contained on them in his individual capacity, or for any purpose other than to support Plaintiff's business.

41.     Beginning on February 12 after he was terminated for cause, the Company repeatedly requested that McFadden return any and all confidential client information that he took, which, upon information and belief, also includes client account information for clients that are still with TJT Capital.  Plaintiff received no response from McFadden for weeks.  Based on recent events, Plaintiff believes he is still in possession of copies of the Company's confidential client information and previously disclosed it (including account numbers) to VIP while still registered with – and acting as a fiduciary for – Plaintiff.

42.     The Company has also discovered that prior to his departure, McFadden entered the office outside of business hours and secretly reviewed hard copies of the Company's client files, copies of which, upon information and belief, McFadden also still possesses.  Although McFadden was involved with responding on Plaintiff's behalf to an SEC audit in late 2024 and early 2025, it was Cook who had to schedule multiple team meetings to ensure that the audit was adequately

addressed and both he and McMullan made substantial efforts to compile, generate, and format the information requested by the SEC, including client lists and quarterly performance reports, because McFadden was pre-occupied with his VIP venture and failed to fully discharge his responsibilities as CCO. The Company therefore believes that McFadden's late-night presence in the office and reviewing of Plaintiff's files was for his own and VIP's benefit in connection with his pending departure to VIP.

43.    Indeed, phone records for McFadden's TJT Capital cell phone number show that when the SEC audit started, he began speaking regularly to Hodges, obviously about VIP, Hodge's own firm. More specifically, beginning on October 17, 2024 and for months after, McFadden and Hodges had at least 31 phone calls, with many stretching on for more than 30 minutes and some for more than an hour.

44.    McFadden's call logs also show that he reconnected with an old colleague, Joan Guccione ("Guccione"), who is now an investment advisor with VIP. Specifically, beginning on October 16, 2024, McFadden had at least 9 phone calls with Guccione, with many of those calls also lasting for more than 30 minutes.

45.    It is likely that McFadden had significant additional communications with Hodges and Guccione through means other than his TJT Capital cell phone. But even just the call volumes recorded on his TJT Capital cell phone demonstrate that McFadden was not engaged in merely exploring or planning his departure from TJT Capital. Rather, he was already neck deep in an ongoing effort *before* he left TJT Capital – and with the direct assistance of VIP and Hodges, its head honcho – to divert TJT Capital clients to VIP by, among other things, telling those TJT Capital clients exactly where he was going (to VIP) and that their accounts would naturally follow him to VIP.

46.    While discovery in this matter will reveal the full extent of McFadden's pre-departure communications, Plaintiff has already learned that McFadden sent numerous emails from his TJT Capital email address to TJT Capital clients concerning his departure to VIP.  McFadden knew he was crossing the line – and breaching his fiduciary duty to TJT Capital – by sending these communications, and that is why he deleted them all, hoping to avoid detection by Cook and McMullan.

47.    As just one known example of the coordination between his communications with Hodges and TJT Capital clients, on January 29, 2025 – while sitting in TJT Capital's office – McFadden had a 53-minute call with Hodges.  The very same day he urgently emailed multiple TJT Clients about his pending departure to VIP and his desire to take their accounts with him, emails which he then deleted but were recovered from Plaintiff's email backup.

48.    Specifically, McFadden wrote to one client:

[Client]:

I am sure you are enjoying Thailand.  I have spoken with [client two] and [client three] and have a call into [client four].  I am hoping [client two] filled you in a bit, but if you have a chance please call me on my cell, 203-898-5294, or the office.  You can e-mail me back and I can let you know if one time works better than another.  Thanks.

Tim

49.    Also on January 29, 2025, he wrote to another client:

[Client]:

I do need to speak with you at your convenience.  My cell is probably best, 203-898-5294, or you can let me know when is a good time to call you and what is the best number to reach you.  All is good up here.  Thanks.

Tim

50.    As these communications demonstrate, McFadden had been contacting TJT Capital clients *before* he left TJT for the purpose of directing them to VIP and taking those client accounts away from Plaintiff (125 of which, amounting to $70 million in AUM, have now left).

51.    Indeed, another email McFadden received from a TJT Capital client on February 5, 2025 asked when she would receive "the information you were going to send by regular mail." Plainly, McFadden had been discussing his departure to VIP with many TJT Capital clients long before he stopped working for TJT Capital. And, in order to avoid detection from Cook and McMullan, he sent hard copy letters in the mail to those clients, which Plaintiff has since learned were received by many (if not all) of the clients whose accounts have now moved over to VIP.

52.    Even more telling, yet another TJT Capital client wrote to McFadden on the morning of February 12, 2025, and said: "Hope your new status is going well." Defendant deleted this incriminating email too.

53.    McFadden received this email *before* Cook and McMullan discovered his dual registration and terminated him – in other words, while he was still a fiduciary of TJT Capital. This TJT Capital client was obviously already aware of McFadden's "new status" at VIP prior to his disclosure of that status to Plaintiff (which Defendant never disclosed and Plaintiff discovered itself), and at a time when he was still required to be servicing those clients exclusively on behalf, and for the benefit, of TJT Capital.

54.    And, because McFadden downloaded all of their Schwab account numbers to aid in his effort, he was able to reference those account numbers in communications with TJT Capital clients and, Plaintiff believes, not only comfort those clients with a false impression that their accounts would automatically follow him to VIP, but also coach those clients on how to fill out the necessary paperwork to formally move them over.

55.     Throughout their months of collaboration, Hodges knew (by virtue of his role at VIP and his ongoing discussions with McFadden) that even though McFadden was the primary contact at TJT Capital, the client accounts and their investment advisor contracts were all with TJT Capital and not McFadden individually.

56.     Nonetheless, when McFadden, through VIP and with Hodges' knowledge, sent TJT Capital clients the DocuSign forms to sign their accounts over to VIP, he failed to inform them that they were free to remain with TJT Capital.  His correspondence purposefully – and falsely – misled Plaintiff's clients into believing that their accounts would automatically follow him to his new RIA and that the requested paperwork was a mere formality rather than what it actually amounted to:  the breaking of an existing contract with TJT Capital and entry into a new one with VIP.

57.     One such message to a TJT Capital client, which was a template for similar client outreach, read as follows:

Dear [Client],

I am delighted to announce that I have decided to join Value Investment Professionals, LLC, a NYC-based investment advisory firm.  First and foremost, they share my investment philosophies as fee-only fiduciaries.  Additionally, I will have more robust operations and investment research support at the new firm.

With VIP, the things that are important to you will remain the same.  I will be your primary point of contact, your billing rate will not change, our custodian is still Schwab, your account numbers will remain the same, and the statement will be nearly identical.

I will continue to manage your accounts as part of VIP.  This will require your authorization.  Please fill out the attached DocuSign envelope to give the necessary permissions.  Additionally, please disregard any communications from TJT Capital.

Thank you for your continued trust and confidence. If you have any trouble with the DocuSign, please do not hesitate to call 646-383-7757 for assistance.

Best Regards,
Tim McFadden, CFP

58.     Notably, McFadden made sure to mention that their Schwab account numbers – which he already downloaded from TJT Capital's system – would not change, in an effort to reassure them that he should remain in charge of their accounts.  He also purposefully cast TJT Capital in a negative light in an attempt to undermine the trust that TJT Capital's clients had placed in the Company for years by specifically telling Plaintiff's clients to "disregard any communications from TJT Capital."

59.     As it turns out, Hodges and Guccione were not the only VIP affiliated individuals with whom McFadden had been conspiring to steal TJT Capital clients.  On January 22, 2025 – weeks before the above referenced email was sent – McFadden had two phone calls totaling 25 minutes with Phillip Shinn ("Shinn"), who, upon information and belief, is an operations associate at VIP.

60.     It was Shinn who later sent the DocuSign email referenced above, from VIP on behalf of McFadden.  There is no reason that McFadden would need to speak with a low-level VIP employee – let alone for 25 minutes – unless he and VIP were actively in the process of preparing changeover forms for TJT Capital clients.  On information and belief, Shinn could not have sent this email from VIP without his boss – Hodges' – knowledge and approval.

61.     The circumstances also indicate that McFadden had been feeding TJT Capital client information (including names and account numbers) to VIP long before the DocuSign email was sent. The reason he did so was simple:  to position himself and VIP to greatly decrease the time it would take to formally move over (i.e. "delink") the 125 client accounts that have now left, so that they could accomplish this *before* Plaintiff could catch wind of Defendants' coordinated plan.  That is how McFadden was able to so rapidly drain these client accounts from Plaintiff.  Indeed, if he was so certain that they would all follow him to VIP had he actually disclosed his VIP registration to TJT Capital, there would have been no need for the months of subterfuge.

62.     It is no coincidence that within just a matter of days after the February 15, 2025 filing of this complaint (which included a holiday weekend), McFadden was able to deliver 62 TJT Capital client accounts to VIP.  Indeed, by the time of the March 3, 2025 oral argument on Plaintiff's application for a temporary restraining order, McFadden had nearly doubled that number, to 107 client accounts, with more going to VIP in the days immediately following oral argument and before the Court even issued its ruling on March 7.  This was the prize that Hodges had been working toward with McFadden for months, as VIP's industry footprint was instantly enhanced.

63.     All of these TJT Capital client accounts were already lined up and ready to go based upon McFadden's, Hodges, and VIP's coordinated efforts to compete with Plaintiff for those accounts, which began months before McFadden exited his role as a fiduciary of TJT Capital.

64.     And that is why, as Plaintiff has now discovered, on November 18, 2024 – the day after McFadden sent himself the TJT Capital client list – McFadden drafted and saved on his company computer a virtually identical correspondence as the DocuSign email quoted above that VIP ultimately sent out on his behalf.

65.     Indeed, the TJT Capital client who received the above DocuSign email responded to McFadden, asking "why does [Shinn] ask for all this info he should already have?"

66.     Plainly, this person had been led to believe that McFadden would (and did) provide her's, and all other TJT Capital client account information, directly to VIP.

67.     As such, McFadden has utilized the Company's confidential client information to benefit himself, VIP, and its owner, Hodges, both before and after he stopped working for Plaintiff.

68.     The facts and circumstances alleged above demonstrate that McFadden shared TJT Capital's confidential client information with VIP, and specifically with Hodges, Shinn, and Guccione.

69.     The facts and circumstances alleged above also demonstrate that McFadden provided detailed information about TJT Capital's clients to Hodges and VIP, including the number of accounts and associated assets under management, which he promised to deliver to VIP, in order to induce Hodges to hire him and whet his appetite for additional assets under management.  As noted above, as a smaller firm with under $150 million assets under management, VIP and Hodges were desperate to acquire those assets and client accounts and Hodges rewarded McFadden by making him a managing member at VIP.

70.     As such, McFadden has been actively aided and abetted by VIP, Hodges, Guccione, and Shinn in his (now successful) attempts to steal TJT Capital's clients and unfairly compete with Plaintiff before he even stopped working for Plaintiff.

71.     McFadden's actions are particularly egregious not only given his prior role as the Company's Chief Compliance Officer, but also because he has previously been sued – and enjoined – in this very Court, for similar unauthorized taking and use of confidential client information from a prior employer.  *See Genworth Financial Wealth Management, Inc. v. Timothy McMullan, James Cook, Timothy McFadden, Karen Bazon, Tamara Rivera and TJT Capital Group, LLC*, Civ. No. 09-cv-01521-DCP (D. Conn.) ("Genworth Matter").  In no way is McFadden's conduct immunized by the fact that Cook and McMullan were also defendants in the Genworth Matter.

72.     So brazen was McFadden's conduct that he even permitted VIP to identify his TJT Capital cell phone number (since disconnected) as a VIP phone number in its February 5, 2025 Form ADV filed with the SEC.

73.     Plaintiff, through counsel, notified VIP and Hodges about McFadden's obligations with regard to its confidential client information and sought assurances that VIP is not in possession

of, or using, same, as well as requested that it remove the TJT Capital phone number from its Form ADV. No response has been received from Hodges or VIP as of the filing of this amended complaint.

74.    The facts and circumstances alleged above also demonstrate that when he contacted clients of TJT Capital on and before February 12 for the purpose of moving them over to VIP, McFadden misrepresented the nature of his association with TJT Capital and/or the status of his RIA registration.

75.    As a result of Defendants' actions, including without limitation the improper use of Plaintiff's confidential client information and McFadden's separate breach of his fiduciary duty and duty of loyalty to Plaintiff, TJT Capital has already lost 125 client accounts and with them, over $70 million worth of assets under management. Plaintiff has also suffered and is threatened with the continued erosion and loss of further client relationships, confidential information, trade secrets, and Company goodwill. Defendant has already used TJT Capital's confidential information and trade secrets to solicit and obtain business from TJT Capital clients and, upon information and belief, continues to make efforts to do so.

76.    Even without use of Plaintiff's confidential client information, Defendant – aided and abetted by Hodges and VIP – breached his fiduciary duty and duty of loyalty to Plaintiff by competing with Plaintiff while still a fiduciary of Plaintiff.

77.    But for Defendants' actions, Plaintiff had a reasonable expectation of continuing, for at least five years, to derive revenue from, and maintain its client relationships with, all the TJT Capital clients who have since moved over to VIP, as those client accounts had been with Plaintiff for many years, including many since Plaintiff's inception.

78.    Plaintiff has been damaged in an amount to be determined at trial, but no less than the average annual fees that Plaintiff would have derived for a period of five years from all 125 client

accounts that have been diverted to VIP as a result of Defendants' actions, which amounts to approximately $2.5 million.

79.    Plaintiff has been additionally damaged by the loss of business value in TJT Capital as a result of Defendants' actions, which resulted in an approximately 20% diminution in its total assets under management, from about $360 million down to $290 million.  This directly impacts, and significantly reduces, the potential sale value of TJT Capital.

## AS AND FOR A FIRST CAUSE OF ACTION
## BREACH OF CONTRACT
### (Against McFadden)

80.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

81.    Defendant agreed to be bound by the LLC Agreement, which is a valid and enforceable contract under which Plaintiff has honored its obligations.

82.    Defendant also agreed to be bound by the Company's Privacy Policy and its Policies and Procedures, which also constitute valid and enforceable contracts under which Plaintiff has honored its obligations.

83.    Defendant breached its obligations under those agreements as alleged above and unless enjoined, will continue to breach his obligations thereunder.

84.    Defendant's conduct has caused and stands to cause TJT Capital substantial and immediate irreparable injury, including the actual and potential loss of client relationships and goodwill, as well as the use and disclosure of its confidential and proprietary client information.

85.    As a result of Defendant's breaches, TJT Capital has also suffered damages in an amount to be determined at trial, but no less than $2.5 million.

**AS AND FOR A SECOND CAUSE OF ACTION**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030 et seq.)**
**(Against McFadden)**

86.     Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

87.     TJT Capital uses its computers in interstate commerce.

88.     TJT Capital's computers are protected computers within the meaning of the Computer Fraud and Abuse Act.

89.     Defendant intentionally accessed TJT Capital's non-public client information residing on TJT Capital's computers by using his TJT Capital password to access such information and transfer that information to himself, outside of TJT Capital's possession, by sending it to his personal email address, thereby obtaining TJT Capital's valuable, non-public, confidential and proprietary client information.

90.     In so doing, Defendant exceeded and misused his authority to access TJT Capital's computers.

91.     Defendant's actions have caused, and will continue to cause, losses to TJT Capital exceeding $5,000 and in an amount to be determined at trial, but no less than $2.5 million.

92.     Defendant's actions have caused and stand to cause TJT Capital substantial and irreparable injury, including the actual and potential loss of client relationships and goodwill, as well as its confidential, proprietary and trade secret information.  Defendant will continue to cause further injury to TJT Capital unless permanently enjoined.

**AS AND FOR A THIRD CAUSE OF ACTION**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. §1836 et seq.)**
**(Against McFadden, VIP and Hodges)**

93.     Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

94.     TJT Capital owns its confidential client information, which consists of client lists, client contact information, and client account information, and constitutes confidential and proprietary business information.  It is used by TJT Capital in interstate commerce.

95.     The confidential client information constitutes trade secrets under Connecticut and federal law as it contains proprietary and confidential information essential to TJT Capital's business and from which TJT Capital obtains value by it not being known to the general public.

96.     TJT Capital has taken appropriate measures, reasonable under the circumstances, to maintain the secrecy of the confidential information, by restricting access to the confidential client information.

97.      As alleged herein, McFadden acquired TJT Capital's confidential client information by improper means, has used or disclosed it to a third party, VIP and Hodges, for his own benefit and without TJT Capital's consent, and continues to use it in interstate commerce.

98.     Although Plaintiff is only currently aware of the confidential client account information for the 171 client accounts that Defendant downloaded from Plaintiff's system and emailed to his personal email on November 17, 2024, Defendant also had the same access to confidential client information for all the rest of TJT Capital's clients.  Upon information and belief, McFadden is in possession of this additional client account information, and there is a risk that McFadden will disclose it to VIP, and/or use this confidential information for his own and VIP's benefit in the future.

99.     As alleged above, VIP and Hodges have also directly benefited from, provided substantial assistance to, and aided and abetted McFadden's misappropriation and are therefore also liable for misappropriation.

100.    TJT will continue to be injured by Defendant's actions unless he is enjoined from further misappropriation.

101.    TJT Capital has also been damaged as a result of Defendant's actions, in amount to be determined at trial, but no less than $2.5 million.

<strong><u>AS AND FOR A FOURTH CAUSE OF ACTION</u></strong><br>
<strong><u>VIOLATION OF THE CONNECTICUT UNIFORM TRADE SECRETS ACT</u></strong><br>
<strong><u>(CT Gen. Stat. §35-55)</u></strong><br>
<strong><u>(Against McFadden, VIP and Hodges)</u></strong>

102.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

103.    TJT Capital owns its confidential client information, which consists of client lists, client contact information, and client account information, and constitutes confidential and proprietary business information.

104.    The confidential client information constitutes trade secrets under Connecticut law as it contains proprietary and confidential information essential to TJT Capital's business and from which TJT Capital obtains value by it not being known to the general public.

105.    TJT Capital has taken appropriate measures, reasonable under the circumstances, to maintain the secrecy of the confidential information, by restricting access to the confidential client information.

106.     As alleged herein, Defendant acquired TJT Capital's confidential client information by improper means, has used or disclosed it for his own benefit and for VIP's benefit, and without TJT Capital's consent, and continues to use it for his own benefit.

107.    Although Plaintiff is only currently aware of the confidential client account information for the 171 client accounts that Defendant downloaded from Plaintiff's system and emailed to his personal email on November 17, 2024, Defendant also had the same access to confidential client information for all the rest of TJT Capital's clients.  Upon information and belief,

McFadden is in possession of this additional client account information, and there is a risk that McFadden will disclose it to VIP, and/or use this confidential information for his own and VIP's benefit in the future.

108.    As alleged above, VIP and Hodges have also directly benefited from, provided substantial assistance to, and aided and abetted McFadden's misappropriation and are therefore also liable for misappropriation.

109.    TJT will continue to be injured by Defendant's actions unless he is enjoined from further misappropriation.

110.    TJT Capital has been damaged as a result of Defendant's actions, in amount to be determined at trial, but no less than $2.5 million.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**COMMON LAW MISAPPROPRIATION OF TRADE SECRETS**
**(Against McFadden, VIP and Hodges)**

111.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

112.    TJT Capital owns its confidential client information, which consists of client lists, client contact information, and client account information, and constitutes confidential and proprietary business information.

113.    The confidential client information constitutes trade secrets under Connecticut law as it contains proprietary and confidential information essential to TJT Capital's business and from which TJT Capital obtains value by it not being known to the general public.

114.    TJT Capital has taken appropriate measures, reasonable under the circumstances, to maintain the secrecy of the confidential information, by restricting access to the confidential client information.

115.    As alleged herein, Defendant acquired TJT Capital's confidential client information by improper means, has used or disclosed it for his own benefit and without TJT Capital's consent, and continues to use it for his own benefit.

116.    Although Plaintiff is only currently aware of the confidential client account information for the 171 client accounts that Defendant downloaded from Plaintiff's system and emailed to his personal email on November 17, 2024, Defendant also had the same access to confidential client information for all the rest of TJT Capital's clients.  Upon information and belief, McFadden is in possession of this additional client account information, and there is a risk that McFadden will disclose it to VIP, and/or use this confidential information for his own and VIP's benefit in the future.

117.    As alleged above, VIP and Hodges have also directly benefited from, provided substantial assistance to, and aided and abetted McFadden's misappropriation and are therefore also liable for misappropriation.

118.    TJT Capital will continue to be injured by Defendant's actions unless he is enjoined from further misappropriation.

119.    As a result of Defendant's actions, TJT Capital has been damaged in amount to be determined at trial, but no less than $2.5 million.

<u>AS AND FOR A SIXTH CAUSE OF ACTION</u><br><u>BREACH OF FIDUCIARY DUTY AND BREACH OF THE DUTY OF LOYALTY</u><br><u>(Against McFadden)</u>

120.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

121.    While he was a member of, and registered with, TJT Capital, Defendant owed fiduciary duties and a duty of loyalty to TJT Capital pursuant to Delaware and/or Connecticut law.

Defendant also owed fiduciary duties to Plaintiff as an officer of the Company (its Chief Compliance Officer).

122.    TJT Capital's LLC Agreement does not disclaim fiduciary duties.

123.    Defendant's actions as alleged herein constitute a breach of his fiduciary duty and a breach of his duty of loyalty to TJT Capital.

124.    Even if he did not use any of Plaintiff's confidential client information, McFadden's actions still constitute a breach of his fiduciary duty and duty of loyalty to Plaintiff because he went beyond preparing to compete and began actually competing with Plaintiff before he ceased being a fiduciary of Plaintiff.

125.    TJT Capital has been damaged as a result of Defendant's actions, in an amount to be determined at trial, but no less than $2.5 million.

<u>AS AND FOR A SEVENTH CAUSE OF ACTION</u>
<u>TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR</u>
<u>ADVANTAGEOUS BUSINESS RELATIONS</u>
<u>(Against McFadden, VIP, and Hodges)</u>

126.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

127.    TJT Capital has had substantial and ongoing contractual relationships with its clients, whom Defendants have already diverted, or are actively attempting to divert.

128.    TJT Capital also had a reasonable business expectancy in maintaining all of its client relationships in the future, encompassing both clients that have already been diverted by Defendants to VIP, as well as current clients that Defendants may still be actively attempting to divert to VIP.

129.    TJT Capital also has a reasonable expectation of entering into continued contractual relationships with its clients and potential clients.

130.    McFadden, VIP, and Hodges were all aware of the contracts between TJT Capital and its clients and were also all aware that McFadden did not have any such contracts in his individual capacity with any of TJT Capital's clients.

131.    By engaging in the conduct described above, McFadden, Hodges, and VIP have used improper and/or tortious means to intentionally and wrongfully interfere with TJT Capital's contractual and/or business expectancy relationships with its clients and potential clients, and caused TJT Capital clients to end their contracts with Plaintiff and/or to not enter into contracts with TJT Capital.

132.    As a result of Defendants' actions, TJT Capital has been damaged in an amount to be determined at trial, but no less than $2.5 million.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**VIOLATION OF CONNECTICUT'S UNFAIR TRADE PRACTICES ACT ("CUTPA")**
**(Against McFadden, VIP, and Hodges)**

133.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

134.    McFadden, VIP, and Hodges actions alleged above – which include providing false and misleading information to TJT Capital clients about the status of their accounts with TJT Capital and instructing them to ignore communications from TJT Capital, their registered investment advisor – are unethical, unscrupulous, unfair, and deceptive, and constitute an unfair method of competition and unfair or deceptive acts or practices in the conduct of trade and commerce, in violation of the CUTPA (Conn. Gen. Stat. §§ 42-110, et seq.).

135.    VIP sent correspondence to TJT Capital's clients on behalf of McFadden and assisted McFadden in his efforts to unfairly compete with Plaintiff.  As VIP's owner, Hodges was fully aware of and approved that correspondence.  Defendants' conduct was intentional and willful.

136.    Defendants' violations of the CUTPA were carried out for the purpose of competing unfairly with Plaintiff.  Hodges and VIP knew that McFadden had a duty not to compete for Plaintiff's clients while still working for, and acting as a fiduciary of, Plaintiff.

137.    Defendants' violations of the CUTPA include intentionally deceiving consumers (*i.e.* TJT Capital's clients).

138.    As a result of Defendants' violation of the CUTPA, Plaintiff has suffered damages in an amount to be determined at trial, but no less than $2.5 million.

## AS AND FOR A NINTH CAUSE OF ACTION
## USURPATION OF CORPORATE OPPORTUNITY
### (Against McFadden)

139.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

140.    Defendant was a fiduciary of Plaintiff while he was a member, investment advisor, and Chief Compliance Officer of TJT Capital.

141.    Maintaining and expanding its client relationships was a corporate opportunity that was within Plaintiff's line of business, that Plaintiff had a reasonable interest or expectancy in maintaining or expanding, and that Plaintiff was financially able to pursue.

142.    As alleged above, Defendant's actions while a fiduciary of TJT Capital – including but not limited to the taking of TJT Capital's confidential client information for himself and for VIP and sending emails to TJT Capital clients from his TJT Capital email address for the purpose of moving them over to VIP while he was still a fiduciary of Plaintiff and holding himself out as such to Cook and McMullan – constituted a breach of his fiduciary to TJT Capital because it placed Defendant's personal interests adverse to Plaintiff.

143.    Defendant's conduct has resulted in a taking of Plaintiff's corporate opportunities and resulted in damages to Plaintiff in an amount to be determined at trial, but no less than $2.5 million.

## AS AND FOR A TENTH CAUSE OF ACTION
## FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against VIP and Hodges)

144.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

145.    As alleged above, McFadden breached his fiduciary duty to Plaintiff.

146.    At the time they provided assistance to McFadden, and aided and abetted his tortious scheme, VIP and Hodges were aware of McFadden's role as a fiduciary of Plaintiff and that he was engaged in a tortious scheme in breach of his fiduciary duty, to divert TJT Capital's clients away from Plaintiff.  VIP and Hodges knew that McFadden's actions constituted a breach of his fiduciary duty to Plaintiff.

147.    As alleged above, VIP and Hodges knowingly and substantially assisted McFadden's principal violation of his fiduciary duty.

148.    As a result of VIP's and Hodges actions, Plaintiff has been damaged in an amount to be determined at trial, but no less than $2.5 million.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
## FOR UNJUST ENRICHMENT
### (Against VIP and Hodges)

149.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

150.    As a result of VIP's and Hodges' actions, they have (and will) benefit in the form of advisory fees flowing from the TJT Clients that are now with VIP.

151.    The manner in which TJT Capital's clients were moved from TJT Capital to VIP, all as alleged above, was unjust and as such, VIP and Hodges have unjustly failed to pay Plaintiff for the benefits of having 125 new client accounts and an additional $70 million in AUM under management.

152.    As VIP's founder and principal owner, Hodges was greatly incentivized to undertake the course of action alleged above and he has (and will) directly and personally benefit from the advisory fees that are now flowing to VIP rather than TJT Capital.

153.    All of this was to Plaintiff's detriment.

154.    Plaintiff has no contractual remedy against VIP and Hodges.

## JURY TRIAL

Plaintiff demands a trial by jury of all issues and claims in this action that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief, with all monetary damages to be assessed jointly and severally against all Defendants, with such amount to be determined at trial but no less than $2.5 million:

(a) A permanent injunction preventing Defendants from possessing, using, or disclosing TJT Capital's confidential client information for any of TJT Capital's current clients;

(b) An accounting of the monies obtained through Defendants' wrongful acts (i.e. the proceeds obtained from TJT Capital's clients that Defendants have diverted to themselves);

(c) Disgorgement of the monies obtained through Defendants' wrongful acts;

(d) Lost profits;

(e) Compensatory damages;

(f) Double damages as provided by statute

(g) Punitive damages as provided by statute

(h) Attorneys' fees and costs, and

(i) Such other and further relief as the court deems just and proper.

Dated:  April 7, 2025
        Bridgeport, Connecticut

LAZARE POTTER GIACOVAS
   & MOYLE LLP

By:   ___s/ Michael Conway_____
        Michael Conway
Robert A. Giacovas (*Pro Hac Vice*)
Jacob A. Englander  (*Pro Hac Vice*)
Christina Dellaporte (*Pro Hac Vice*)
747 Third Avenue, 16th Floor
New York, NY 10017
(212) 758-9300
(212) 888-3295 (fax)
mconway@lpgmlaw.com
rgiacovas@lpgmlaw.com
jenglander@lpgmlaw.com
cdellaporte@lpgmlaw.com

*Attorneys for Plaintiff*
*TJT Capital Group, LLC*